AO 106 (Rev. 04/10) Application for a Search Warrant                                      AUTHORIZED AND APPROVED/DATE: _____

# UNITED STATES DISTRICT COURT

for the

Western District of Oklahoma

In the Matter of the Search of                          )
*(Briefly describe the property to be searched*          )
*or identify the person by name and address)*            )        Case No. M-24-362-STE
                                                        )
5746 NW 16th Street, Apartment #3,                      )
Oklahoma City, Oklahoma                                 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____Western_____ District of _____Oklahoma_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846 and 841(a) | Drug Conspiracy |
| 18 U.S.C. § 1956 and/or 1957 | Laundering of Monetary Instruments |

The application is based on these facts:
See attached Affidavit of TFO Anthony Finnegan, DEA

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

TFO Anthony Finnegan, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date:     **Apr 22, 2024**                              Shon T. Erwin
_____                         _____
                                                        *Judge's signature*

City and state:  Oklahoma City, Oklahoma                Shon T. Erwin, United States Magistrate Judge
_____                         *Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

**In the Matter of the Search of**
**5746 NW 16th Street Apartment #3,**
**Oklahoma City, Oklahoma**

**Case No.**  M-24-362-STE

**FILED UNDER SEAL**

### Affidavit in Support of an Application
### Under Rule 41 for a Warrant to Search and Seize

I, Task Force Officer Anthony Finnegan, being first duly sworn under oath, depose and state:

### Introduction and Agent Background

1.   I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search **5746 NW 16th Street Apartment #3, Oklahoma City, Oklahoma**, Western District of Oklahoma, as further described in Attachment A, for the things described in Attachment B.

2.   I am presently assigned as a Task Force Officer (TFO) with the DEA Tulsa Resident Office (TRO) and have been since April 2019. I am also a police officer for the Tulsa Police Department and have been so for approximately fifteen years. I have a Bachelor of Science in Business Administration-Management from the University of Tulsa. During my time as a Narcotics Investigator with the Tulsa Police Department and as a TFO with the DEA, I have participated in wire and physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, debriefings of informants, and

reviews of taped conversations and drug records. During my time as a TFO with the DEA, I have participated in complex international conspiracy investigations involving organizations responsible for the unlawful manufacturing, importation, transportation, and distribution of drugs. I have also investigated corruption and violent criminal offenses related to the activity of DTOs. I have been involved in drug trafficking investigations of an international, national, and regional scope.

3.    I have completed the Clandestine Laboratory Basic Safety Certification and Clandestine Laboratory Site Safety Officer courses. I am certified in the recognition of the methods of manufacturing methamphetamine and am also certified to dismantle clandestine laboratories. During this training, your affiant was certified to recognize the chemicals and equipment needed for the illegal manufacture of methamphetamine. I am knowledgeable about state and federal drug laws. I have completed the Drug Enforcement Administration Basic Narcotics Investigator School. I have attended the Drug Enforcement Administration Task Force Officer School. I have received formal training in narcotics investigations from the Tulsa Police Academy, as well as informal training received from more experienced officers. I have completed the Indoor Marijuana Grow Investigations School. I have attended the Reid Technique of Interviewing and Interrogation School. I have attended the Operation Jetway Interdiction Course. I have authored both state and federal search warrants and have participated in Title III investigations. I have purchased narcotics in an undercover capacity and participated in controlled

2

deliveries of narcotics. I have interviewed numerous individuals involved in the use, sales, manufacturing. and transportation of illegal narcotics. I have learned of the distribution schemes utilized by individuals involved in drug trafficking organizations. During the course of my training and experience with various defendants, I have learned how individuals involved in drug distribution schemes maintain records and conspire to deceive law enforcement as well as rival distributors of controlled dangerous substances. Through this training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed and the methods of payment for such drugs. I have participated in numerous complex conspiracy cases prosecuted within the federal justice system. I have trained other narcotics detectives within the Tulsa Police Department's Special Investigations Division.

4.    As a result of my personal participation in the investigation of matters referred to in this affidavit and based upon reports made to me by other law enforcement agencies and witnesses, I am familiar with the facts and circumstances of this investigation. The property to be searched is described in Attachment "A." Attachment "B" is a list of items for which authority is sought to search and seize. Since this affidavit is presented to support an application for a search warrant of the premises described on Attachment "A," I have not included each and every fact I know concerning this investigation. However, I have set forth the facts that I believe are essential to establish the necessary foundation and probable cause to support the

Application for Search Warrant and Search Warrant for the property to be searched described in Attachment "A."

5.    Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that evidence of violations of Title 21, United States Code, Section 846 and 841(a) – Drug Conspiracy and Title 18, United States Code, Sections 1956 and/or 1957 –Laundering of Monetary Instruments will be located at **5746 NW 16th Street Apartment #3, Oklahoma City, Oklahoma**, Western District of Oklahoma as further described in Attachment A.

### Jurisdiction

6.    "[A] warrant may be issued to search for and seize any property that constitutes evidence of a criminal offense in violation of the laws of the United States." 18 U.S.C. § 3103a.

7.    The requested search is related to the following violations of federal law:

    a.  21 U.S.C. §§ 846 and 841(a) – Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances, and

    b.  18 U.S.C. §§ 1956 and/or 1957 – Laundering of Monetary Instruments

8.    Venue is proper because the person or property described in this affidavit is located within the Western District of Oklahoma. Fed. R. Crim. P. 41(b)(1).

### Drug Offenses Background

9.    I have had extensive experience in debriefing defendants, co-conspirators, witnesses, and informants who have been involved in unlawful drug trafficking and

4

who have had personal experience involving the techniques and methods by which drug traffickers maintain records to identify and locate other drug conspirators, the amounts of drugs distributed and to whom the drugs are distributed, the moneys owed and paid for drugs, as well as the techniques and methods by which drug traffickers acquire, spend, convert, transport, distribute, and conceal the proceeds they derive from unlawful drug trafficking.

10.     My participation in drug trafficking investigations has resulted in both the successful prosecution of numerous individuals and the forfeiture to the United States Government of assets purchased with the proceeds from unlawful drug trafficking, as well as assets used to facilitate said violations. In connection with drug trafficking investigations, I have participated in and/or executed several search and seizure warrants at residences, stash houses used as storage and distribution points for controlled substances, and other locations.

11.     Materials searched for and recovered in those locations have included various controlled substances, including cocaine, methamphetamine, and marijuana; drug paraphernalia such as scales, papers and drug packaging materials; books and records reflecting sales, the transfer or transportation of drugs and amounts of money owed for drugs; records reflecting the names, addresses, and telephone numbers of co-conspirators; sales receipts and other records reflecting the expenditure of moneys that are the proceeds from unlawful drug distribution; currency and money wrappers; computers and computer discs containing drug ledgers and records, and various

valuable assets (i.e., automobiles) purchased with the proceeds of unlawful drug trafficking.

12.    Based on my background, training, and experience, as previously detailed in this affidavit, I know:

a.    Drug traffickers often place assets in names other than their own to avoid detection of these assets by law enforcement. In addition, drug traffickers often use rental vehicles to prevent detection and identification by law enforcement and to prevent forfeiture of the vehicles;

b.    Even though these assets are in the names of other people, the drug traffickers continue to use these assets and exercise dominion and control over them;

c.    Drug traffickers must maintain a large amount of U.S. currency in order to finance their ongoing narcotic activities;

d.    Drug traffickers maintain books, computer data and programs, records, receipts, notes, ledgers, airline tickets, money orders, cashier's checks, records of wire transfers, records of purchase of vehicles and property and other papers relating to the importation, ordering, sale, transportation, possession, purchase, and transfer of controlled substances;

e.    Drug traffickers keep records that are usually recorded in units of weight and monetary value, associated with pounds and kilograms or other such units of measurement and dollar amounts to assist them in their business, records to

keep track of amounts "fronted" to customers and money owed by customers for amounts "fronted" by the trafficker; the aforementioned records, books, notes, ledgers, etc., are maintained where drug traffickers have ready access to them, i.e., on their persons, in their vehicles, or in or about their residences or place of business, these documents are often kept in code to secret their meaning from law enforcement;

     f.     It is common for drug traffickers to secrete contraband, proceeds of drug sales, financial instruments, precious metals, jewelry, and other items of value, and/or proceeds of drug transactions, records or evidence of drug transactions relating to transferring, secreting, or spending of large sums of money made from engaging in narcotic trafficking in secure locations on their persons, within their vehicles, or within or around their residences or businesses for ready access or to conceal them from law enforcement authorities;

     g.     When drug traffickers amass proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits. To accomplish these goals, drug traffickers utilize some, if not all, of the following means; foreign and domestic banks and their attendant services, securities, cashier's checks, money orders, bank drafts, letters of credit, real estate, shell corporations, and business frauds;

     h.     Drug traffickers commonly maintain names, addresses, or telephone numbers in books or papers for their associates in the trafficking organization; these

books or papers include such items as address books, telephone messages, in and correspondence, etc. Shorthand and/or code names are sometimes used for buyers, co- conspirators, sellers, weights, and other details of the drug traffickers;

i.    Drug traffickers secrete and maintain in their residences, storage buildings, barns and outbuildings, places of business, family member's residences, and the residences of co-conspirators, financial records which, when analyzed, will show their accumulation and expenditure of money and assets substantially exceeds any legitimate income. I am aware that the courts have recognized that unexplained wealth is probative of crimes motivated by greed, in particular, trafficking in drugs;

j.    The books, records, receipts, notes, ledgers, and other items mentioned above, are commonly maintained where the drug traffickers have ready access to them and are maintained often long periods of time after the actual event reflected in the documents.

k.    Drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their product. These traffickers usually maintain these photographs in their possession;

l.    Drug traffickers usually keep paraphernalia for packaging, cutting, weighing, and distributing narcotics; and these paraphernalia include but are not limited to scales, plastic bags, cutting agents, and other devices used for packaging to aid in the concealment of the drug for its distribution;

m.    The courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, including trafficking in controlled substances;

n.    Dealers in narcotics often keep handguns, ammunition, and other weapons in their residences (including outbuildings), businesses, and automobiles to safeguard supplies of drugs and the fruits of narcotics dealings;

o.    Drug traffickers often operate under assumed names in order to conceal their true identities from law enforcement officers and, in so doing, acquire property, services, and personal identification (such as driver's licenses and birth certificates) under their assumed or alias names and that they maintain such documents in evidence of their false identities in their residences (including outbuildings), businesses, and automobiles together with evidence of their true identities;

p.    Drug traffickers commonly conduct a significant amount of their business by using telephone systems and normally make frequent calls to conduct, direct, supervise, and coordinate their activities;

q.    Drug traffickers commonly keep their stash of controlled substances and currency proceeds separate and store the same in multiple residences (including outbuildings), businesses and automobiles.

### Probable Cause

13.   The DEA, the Federal Bureau of Investigations (FBI) and the Tulsa Police Department (TPD) Special Investigations Division (TPD/SID) are investigating

Domingo Saucedo who is believed to be the head of the Saucedo drug trafficking organization (the "Saucedo DTO" or "DTO"), for arranging the importation of large shipments of methamphetamine and cocaine from Mexico into the United States. The Saucedo DTO consists of several associates of Saucedo and others, both known and unknown to include Gabriel Urquiza-Urquiza, a/k/a "Gabriel Urquiza-Urquiza." Saucedo lives in Mexico. Some of his known associates such as Gabriel Urquiza are based in the Tulsa, Oklahoma area. Based on previous investigations conducted by DEA, TPD and FBI, investigators know that Saucedo and his associates have been smuggling illegal drugs into the United States for years and are presently capable of importing numerous kilograms of methamphetamine and cocaine on a single occasion.

14.   In October 2022, the FBI initiated an investigation into a drug trafficking organization involved in the distribution of large quantities of methamphetamine in the Tulsa, Oklahoma-based area. During this investigation, the FBI identified Saucedo to be a source of supply for illegal narcotics and that he used telephone number 52-732-103-1127. During the FBI investigation, Saucedo directed money laundering of drug proceeds to take place at 12624 East 19th Street, Tulsa, Oklahoma (Gabriel Urquiza-Urquiza's house).

15.   In July 2023, TRO began investigating the Saucedo DTO, including a member responsible for laundering drug proceeds via large bulk currency pickups throughout the United States. Based on his training, experience and knowledge of

this investigation, Affiant knows that large-scale drug trafficking organizations, such as the Saucedo DTO, involved in the distribution of large quantities of illegal narcotics often utilize more sophisticated money laundering schemes to move drug proceeds back to the drug trafficking organization in Mexico. The method of utilizing United States banks begins when a member of the organization has obtained a certain quantity of United States currency (USC) that needs to be moved as it is derived from the sales of illegal narcotics by the organization. A broker is then responsible for arranging the exchange from the individual who is in possession of the USC to another individual who is responsible for getting the USC deposited into a bank account in the United States. Ultimately, these drug proceeds are then transferred from the account in which they were deposited to an account that belongs to the organization. Based on my training and experience, and knowledge of this investigation, I know that after the transfer of USC into the organization's account, the money is withdrawn and/or transferred into other account(s) in Mexico belonging to the organization.

16.    During this investigation, a United States District Judge in the Northern District of Oklahoma, signed affidavits and orders authorizing investigators to intercept communications over telephone number 918-948-0749 (Target Telephone #1) and telephone number 918-200-8532 (Target Telephone #2). These interceptions lasted from January 31, 2024 until April 8, 2024. Both of these numbers were used by Gabriel Urquiza-Urquiza.

11

During the course of interceptions over Target Telephones #1 and #2, investigators have confirmed Hispanic males using telephone number 737-357-5180 (UM5180) and telephone number 619-369-96761 (UM6167) to be facilitators who organize the movement of drug proceeds and the distribution of large quantities of methamphetamine for the DTO.

**Money Deliveries to a Confidential Source**

17.    During this investigation, a Confidential Source (CS)[1] was utilized to make

two controlled pickups of USC from Gabriel Urquiza-Urquiza. On July 13, 2023, the

CS, at the DEA's direction, met up with Gabriel Urquiza-Urquiza and obtained

$80,000. An undercover DEA agent later deposited the money into a bank account.

On August 2, 2023, the CS, at the DEA's direction, again met up with Gabriel

Urquiza-Urquiza and obtained $60,005. The Undercover DEA agent deposited the

money into a bank account.

18.    During the second money delivery, the CS asked to obtain

methamphetamine from Urquiza-Urquiza, who replied that he did not want to "step

on anyone's toes" and would think about it.

---

[1] CS-1 has been cooperating with members of the TRO for approximately one year. CS-1 is
cooperating for the purpose of prosecutorial consideration. No other form of consideration
has been offered to CS-1. While working as a confidential source, CS-1 has provided
information on three or more occasions that has proven to be reliable. CS-1 is familiar with
various drug distribution methods employed by drug trafficking organizations. Additionally,
CS-1 is familiar with the different methods of money laundering employed by drug
trafficking organizations. The information provided by CS-1 has been corroborated by
independent evidence, including surveillance, toll records, court ordered intercepted
communications, and the seizure of narcotics. CS-1 has a prior criminal history for
possession of controlled substances with intent to distribute and possession of firearm. I
believe CS-1 is a reliable and credible confidential source. The information provided by CS-
1 to date is reliable.

## Money Deliveries Intercepted Over Wiretaps

### February 13, 2024

*A. Intercepted calls about a money delivery*

19.   On February 13, 2024, investigators intercepted an audio call about the delivery of drug proceeds between Gabriel Urquiza-Urquiza, and UM6761 and between Urquiza-Urquiza and UM5180. During these calls, Urquiza-Urquiza and UM6761 coordinated a money delivery from a money courier to Urquiza-Urquiza at the El Chico restaurant in Tulsa.

20.   Investigators then intercepted an audio call between Urquiza-Urquiza and UM5180, while Urquiza-Urquiza was on the way to meet this courier. UM5180 directed Urquiza-Urquiza to deliver $25,000 U.S. Currency to a female in a gray car and said that the female was on her way to Tulsa to meet with Urquiza-Urquiza. Additionally, UM5180 told Urquiza-Urquiza to save $6,000. Investigators believe Urquiza-Urquiza was to obtain a total of $31,000 U.S. Currency from a female driving a gray car on behalf of UM6761. UM5180 informed Urquiza-Urquiza that "Oso" owes him (UM5180) $100,000 for 26 kilos of methamphetamine and that it has been three weeks and UM5180's boss wants his money. UM5180 said he (UM5180) had sent another 25 kilograms of methamphetamine and the money Urquiza-Urquiza was picking up today was proceeds from those 25 kilograms.

21.   A Tulsa County District Judge had authorized a tracker warrant for a Jeep Commander registered to Urquiza-Urquiza on xxx. Agents tracked the Jeep

14

Commander to the northeast parking lot of 7100 South and Mingo Road Tulsa, Oklahoma near the Golden Corral.

22.   Investigators intercepted additional calls between Urquiza-Urquiza and UM6761 in which they discussed when the female courier would arrive and Urquiza-Urquiza's location.

*B. Arrival of Leticia GARCIA-Salazar in the gray Chevrolet Malibu*

23.   About 13 minutes after Urquiza-Urquiza arrived near Golden Corral, a gray Chevrolet Malibu, bearing Oklahoma tag NVE512, arrived and parked near Urquiza-Urquiza's Jeep Commander. A registration check of Oklahoma tag NVE512 revealed the tag is registered to a gray 2018 Chevrolet Malibu to Leticia Garcia-Salazar at 3005 SW 60th Street, Oklahoma City, Oklahoma.

24.   Investigators then observed what appeared to be a money exchange, in which Urquiza-Urquiza got out of his vehicle, walked to the gray Chevrolet Malibu, opened the front passenger's door to the Malibu and leaned into the vehicle. A minute later, Urquiza-, now holding a white plastic bag, shut the front passenger's door to the Malibu. Urquiza-Urquiza then walked back to the white Jeep Commander and got back into it. Both vehicles then departed the location.

*C. Driver of the gray Chevrolet Malibu traveled to 7215 South 92nd East Avenue, Apartment 2*

25.   At approximately 12:34 p.m., the gray Chevrolet Malibu arrived at the Chardonnay Apartment complex, located at 7215 South 92nd East Avenue and

parked near Apartment 2. A short time later, investigators established physical surveillance of 7215 South 92nd East Avenue, Apartment 2 and observed a Hispanic female, wearing a brown hoodie, standing at the Chevrolet Malibu. The Hispanic female then walked to and entered Apartment 2 a short time later.

*D. Call by Urquiza-Urquiza to Daisy Villanueva to arrange meeting with a third-party*

26.   At approximately 12:36 p.m., Urquiza-Urquiza utilizing Target Telephone #1 made an outgoing audio call to a Spanish-speaking female (first labeled as UF3103 and later as Daisy Villanueva) at telephone number 405-493-3103 (Session #62). During this call, Urquiza-Urquiza told Villanueva that Urquiza-Urquiza was told to call her (Villanueva), to give her something. Villanueva said yes, to give her (Villanueva) a chance to call another number and that they (the third-party) were on their way. Urquiza-Urquiza asked if she (Villanueva) knew how long it was going to take to arrive. Villanueva said she (Villanueva) would ask again but she (Villanueva) thought it would be around 30 (possibly minutes) and would send Urquiza-Urquiza a message to let him (Urquiza-Urquiza) know.

27.   At approximately 12:45 p.m., surveillance of the Chevrolet Malibu was terminated. At approximately 12:50 p.m., members of the TRO established physical surveillance in the area of the QuikTrip, located at 9529 East 51st Street. At approximately 12:58 p.m., GPS location data indicated the white Jeep Commander departed the QuikTrip, confirmed via physical surveillance. At approximately 1:01

16

p.m. GPS location data indicated the white Jeep Commander had arrived back at 4122 South 88th East Avenue.

28.   At approximately 1:42 p.m., an incoming audio call from telephone number 580-277-2622 was attempted to Target Telephone #1, however, the call was not answered.

29.   During this investigation, investigators determined that the service provider for telephone number 580-2777-2622 is T-Mobile. Furthermore, investigators issued a subpoena to T-Mobile for subscriber information and phone toll data for telephone number 580-277-2622. The results of the subpoenaed revealed telephone number 580-277-2622 is subscribed to Javier Chacon at 504 NE 19th Street, Moore, Oklahoma 73160. Based on a search of an open-source law enforcement database, investigators discovered that Javier Rodarte is also known as "Javier Rodarte-Chacon," and "Javier Chacon."

30.   At approximately 2:10 p.m., GPS location data indicated the white Jeep Commander departed 4122 South 88th East Avenue.

31.   At approximately 2:13 p.m., Urquiza-Urquiza utilizing Target Telephone #1 made an outgoing audio call to a Spanish-speaking female (first labeled as UF3103 and later identified as Daisy Villanueva) at telephone number 405-493-3103 (Session #64). During this call, Urquiza-Urquiza asked her (Villanueva) if it was a guy (the third party). Villanueva said yes, it was a guy in a white car. Urquiza-Urquiza said he (Urquiza-Urquiza) saw him (the third party) and would go that way.

*E. Urquiza-Urquiza met with Javier Rodarte (in a White 2019 Dodge Challenger, Oklahoma tag MCL-420)*

32.   At approximately 2:13 p.m., GPS location data indicated the white Jeep Commander arrived at the QuikTrip, located at 7950 East 41st Street Tulsa, Oklahoma. This was confirmed by physical surveillance. Investigators conducting surveillance observed the white Jeep Commander park near a white Dodge Challenger, bearing Oklahoma tag MCL420. Investigators observed the driver's door of the white Jeep open and the driver exit and walk to the front passenger's door of the white Dodge Challenger. A registration check of Oklahoma tag MCL420 revealed the tag is registered to a white 2019 Dodge Challenger to Daisy Villanueva at **5746 NW 16th Street, Apartment 3 Oklahoma City, Oklahoma**. Investigators conducted a driver's license check for Daisy Villanueva. The search revealed a valid Oklahoma driver's license for Daisy Villanueva with a listed date of birth as 11/10/1990 and an address of **5746 NW 16th Street, Apartment 3 Oklahoma City, Oklahoma 73127**.

33.   A short time later, investigators observed the driver enter back into the white Jeep and depart the location. GPS location indicated the white Jeep Commander departed the QuikTrip, which was confirmed via physical surveillance. At the same time, the white Dodge Challenger traveled to and parked at the fuel pumps.

34.   At approximately 2:16 p.m., GPS location data indicated the white Jeep Commander arrived back at 4122 South 88th East Avenue.

35.   At approximately 2:17 p.m., a Hispanic male, wearing a black hooded sweatshirt and black pants, walked from the white Dodge Challenger and entered the QuikTrip. At approximately 2:22 p.m., the Hispanic male exited the QuikTrip and walked back to the white Dodge Challenger. At approximately 2:23 p.m., investigators on surveillance observed the Hispanic male enter the driver's seat of the Dodge Challenger and depart the QuikTrip. At approximately 2:40 p.m., surveillance of the white Dodge challenger was maintained until the Dodge Challenger continued traveling westbound on I-44 west of the Sapulpa exit.

*F. Identification of Javier Rodarte*

36.   Investigators conducted a search of CashApp for telephone number 580-277-2622 (the number that attempted to contact Urquiza-Urquiza at approximately 1:42 p.m. before the meeting at QuikTrip). This search revealed the name Javier Rodarte to be associated with that CashApp account. Investigators then conducted a search of Javier Rodarte on Facebook which revealed an open and publicly accessible profile for Javier Rodarte with multiple public viewable pictures of a Hispanic male matching the description of the Hispanic male who was driving the white Dodge Challenger and met with Urquiza-Urquiza at the QuikTrip.

37.   Based on my training an experience, and knowledge of this investigation, I believe that Javier Rodarte met with Urquiza-Urquiza at which time Rodarte received drug proceeds from Urquiza-Urquiza as was coordinated by other members of the DTO.

19

*G. Javier Rodarte drove to Oklahoma City*

38.    After surveillance of the white Dodge Challenger was terminated west of the

Sapulpa exit, members of the TRO contacted members of the Oklahoma City

District Office (OCDO) requesting assistance with surveillance of the white Dodge

Challenger as it entered in the Oklahoma City area. At approximately 3:58 p.m.,

OCDO TFO Cecil Nave observed the Dodge Challenger traveling west on I-44 from

exit 146. Surveillance of the Challenger continued as it drove to the Oklahoma City

metro area utilizing I-35 South, to I-40 West, and exiting onto McArthur Boulevard.

39.    At about 4:30 p.m., SA Zach O'Diam observed the Challenger turning right

(east) from McArthur Boulevard into the Summer Oaks Apartment complex at 5744

NW 16th Street, Oklahoma City. Prior to turning into the complex, TFO Brad Neff

maintained surveillance of **5746 NW 16th Street, Apartment 3**. Surveillance of the

Challenger was lost for a short period of time after it turned into the apartment

complex.

40.    At approximately 4:32 p.m., SA O'Diam observed the Challenger appearing

to adjust its parking, as it parked facing north, along a fence, west of **5746 NW 16th**

**Street, Apartment 3**. At about 4:41 PM, SA O'Diam observed Rodarte walking

from the Challenger, towards Apartment 3. At about 4:42 p.m., TFO Neff observed

Rodarte walk to door of Apartment 3, use a key in the door, then looked around. At

that time, surveillance of Rodarte was lost for a short period of time.

*H. Javier Rodarte traveled with a female to 504 NE 19th Street in Moore, Oklahoma*

41.   At approximately 4:43 p.m., TFO Neff observed Rodarte emerge from the apartment with a Hispanic female wearing a white hooded sweatshirt. Both Rodarte and female walked towards the Challenger. As they did so, the female was carrying a purse and a pink/white duffel bag. At about 4:46 p.m., SA O'Diam observed the female walk towards the driver's side of the Challenger while Rodarte got into the front passenger's seat. At approximately 4:47 p.m., SA O'Diam observed the female driving the Challenger north toward NE 16th Street with Rodarte in the passenger's seat. As they exited the apartment complex, surveillance continued of the Challenger. At about 5:15 p.m., TFO Kevin Morales observed the Challenger turning south on Pole Road from NE 27th Street in Moore, Oklahoma. At approximately 5:17 p.m., TFO Morales observed the Challenger park illegally in front of 504 NE 19th Street in Moore, Oklahoma, on the south side of the road, facing west.

42.   At about 5:21 p.m., SA Sean Lively drove by the residence and observed a maroon Toyota truck parked in the driveway, along with a Honda, and a black Toyota Corolla. While driving by, SA Lively observed Rodarte putting on a bookbag and a pink baby car seat on the ground with a box or bag inside of the baby seat positioned next to Rodarte. At about 5:32 p.m., TFO Jeff Williams drove by the residence and observed the Camry was bearing Oklahoma tag GCQ273. According to law enforcement indices, OKLP GCQ273 was assigned to a 2015 Toyota Camry

registered to Javier Rodarte of 504 NE 19th Street, Moore, Oklahoma. TFO

Williams noted that the Challenger was no longer at the residence.

### Seizure of 32 Kilograms of Methamphetamine

43.    On March 12, 2024, at approximately 2:04 p.m., members of the TRO

observed via electronic surveillance, a female matching the description of Leticia

Garcia-Salazar exit the front entry door to 7215 South 92nd East Avenue, Apartment

2 Tulsa, Oklahoma with a large gray plastic tote. Garcia-Salazar had to physically

drag the tote through the front door of the apartment. Leticia Garcia-Salazar dragged

and then pushed the gray tote to the parking lot and the rear of the gray 2018,

Chevrolet Malibu, bearing Oklahoma tag NVE512. Garcia-Salazar placed the tote in

the trunk of the Chevrolet Malibu and closed the trunk lid.

44.    At approximately 2:06 p.m., GPS location data for the tracking device

installed on the Chevrolet Malibu indicated the Chevrolet Malibu departed the

location. I monitored the GPS location data for the Chevrolet Malibu once it

departed. At approximately 2:13 p.m., GPS location data indicated the Chevrolet

Malibu, driven by Garcia-Salazar arrived in the parking lot east of the Abuelo's

Mexican Restaurant, located at 10909 East 71st Street Tulsa, Oklahoma. A short

time later, investigators established physical surveillance of the Chevrolet Malibu and

observed it parked next to an orange Dodge Challenger, bearing Oklahoma tag

KXL725. I observed a Hispanic male, wearing a white t-shirt and red pants at the

trunk of the Chevrolet Malibu. The trunk of the Chevrolet Malibu was open and the

Hispanic male removed the aforementioned gray tote from the trunk of the Malibu

and carried it to the back of the orange Dodge Challenger. At the same time, the

Chevrolet Malibu departed the location. Surveillance of the Chevrolet Malibu was

terminated at that time.

45.   I observed the Hispanic male place the gray tote in the trunk of the orange

Challenger. A registration check of Oklahoma tag KXL725 revealed the tag to be

registered to an orange 2011 Dodge Challenger to Erika Romero at 1501 NW 8th

Street, Oklahoma City, Oklahoma.

46.   At approximately 2:18 p.m., I observed the orange Challenger depart the

Abuelo's parking lot and travel to the Texas Roadhouse parking lot, just east of the

Abuelo's. The Hispanic male exited the driver's seat and walked up to and pulled on

the doors to the Texas Roadhouse that appeared to be locked. The Hispanic male

then entered back into the orange Challenger and traveled east through the parking

lot and stopped at the east end of the shopping center parking lot for approximately

one minute. At approximately 2:21 p.m., I observed the orange Challenger travel

west through the parking lot and then westbound on 71st street. The orange

Challenger failed to signal a lane change on 71st street east of Highway 169. The

orange Challenger then traveled southbound on Highway 169.

47.   At approximately 2:28 p.m., Tulsa Police Department (TPD) Uniform

Officers William Badgett, Ronni Lowman and Joel Burks conducted a probable

cause traffic stop on the orange Challenger at approximately 9200 South Highway

169 southbound Tulsa, Oklahoma. Upon initial contact with the orange Challenger, TPD Officers identified the orange Challenger to be occupied by the Hispanic male driver, wearing the white shirt and red pants and a Hispanic female passenger. The Hispanic male was later identified as Elieser Blanco, and the female passenger identified as Adomaris Jimenez. The TPD Officers confirmed that neither of the occupants of the orange Challenger had a valid driver's license to operate a motor vehicle.

48.  The TPD Officers William Badgett, Ronni Lowman and Joel Burks had both occupants exit the orange Challenger, at which time, Blanco was arrested for driving without a driver's license. TFO Mike Helton, Acting Group Supervisor (A/GS) Taylor Wilson, and I responded to the scene of the traffic stop and conducted a search of the orange Challenger. We located the large gray tote in the trunk. Inside the gray tote were multiple large clear plastic Ziploc baggies that contained a crystal substance, suspected methamphetamine.

49.  A/GS Wilson and I took possession of the large gray tote containing the suspected methamphetamine and transported it to the TRO for processing and safekeeping. TFO Mike Helton conducted a field test of a sample of the crystal substance, which tested presumptive positive for methamphetamine. The gross weight of the Ziploc baggies containing the suspected methamphetamine was 32,604.2 grams (approximately 32 kilograms).

**April 10, 2024**

*A. The white Dodge Challenger is driven to the residence of Javier Rodarte*

50.   On April 10, 2024, while reviewing court authorized GPS location data on the white Dodge Challenger, affiant observed that at approximately 4:11 p.m., GPS location data for the white Dodge Challenger indicated it departed the apartment complex located at **5746 NW 16th Street, Oklahoma City, Oklahoma**. The GPS location data indicated the white Dodge Challenger made a couple of stops before it then arrived within close proximity of 504 NE 19th Street in Moore, Oklahoma at approximately 6:05 p.m. During this investigation, investigators have identified 504 NE 19th Street, Moore, Oklahoma to be the residence of Javier Rodarte.

*B. The white Dodge Challenger is driven to Leticia Garcia-Salazar's Apartment in Tulsa*

51.   At approximately 6:06 p.m., the GPS location data indicated the white Dodge Challenger departed 504 NE 19th Street, Moore, Oklahoma. At approximately 6:38 p.m., Affiant observed court authorized GPS location data on a white Dodge Challenger bearing Oklahoma tag MCL420 to indicate the vehicle was travelling eastbound on the Turner Turnpike, towards Tulsa, Oklahoma, from Oklahoma City, Oklahoma.

52.   At approximately 7:45 p.m., A/GS Taylor Wilson established physical surveillance at Leticia Garcia-Salazar's residence, located at 7215 South 92nd East Avenue, Apartment 2, Tulsa, Oklahoma. During this investigation, investigators have previously observed Daisy Villanueva, in a white Dodge Challenger, to travel to

25

Garcia-Salazar's residence, located at 7215 South 92nd East Avenue, Apartment 2.

At approximately 7:47 p.m., A/GS Wilson observed Garcia-Salazar return to her

residence, driving a black Chevrolet Impala bearing paper tag UD5695003693. Upon

arrival, A/GS Wilson observed Garcia-Salazar exit her vehicle wearing a tan

sweatshirt, dark colored pants, carrying a purse/bag across her body, and to be

talking on the telephone. Garcia-Salazar used a key to enter into Apartment 2.

53.    At approximately 7:52 p.m., A/GS Wilson observed a white Dodge

Challenger arrive and park in the front of Garcia-Salazar's apartment. Subsequently,

A/GS Wilson observed two females exit the white Dodge Challenger and approach

Garcia-Salazar's apartment. The two females waited at the door until they were let

into Garcia-Salazar's apartment. A/GS Wilson observed the first female to be

wearing dark colored pants, a dark gray t-shirt, to have long dark colored hair, and

appear to be carrying an unknown object in her left arm; and the second female to be

wearing dark colored pants, a dark colored sweatshirt, to have long dark colored

hair, and to be carrying a plastic bag.

   C.  *Garcia-Salazar drove to meet with Ricardo Plateado*

54.    At approximately 8:00 p.m., A/GS Wilson observed Garcia-Salazar exit her

apartment and enter into her black Chevrolet Impala. Shortly thereafter, Garcia-

Salazar departed from the apartment complex. TFO Darin Zumwalt maintained

physical and electronic Garcia-Salazar in her black Chevrolet Impala and observed

her travel to the area of Raising Cane's, located at 10707 East 71st Street, Tulsa,

Oklahoma. TFO Zumwalt did not observed Garcia-Salazar meet with anybody or exit her vehicle while located at Raising Cane's. At approximately 8:22 p.m., TFO Zumwalt observed Garcia-Salazar leave from the area of Raising Cane's. TFO Zumwalt observed Garcia-Salazar to drive to various locations near the 71st and Garnett area before ultimately parking in the Target parking lot, located at 10711 East 71st Street, Tulsa, Oklahoma.

55.   At approximately 8:40 p.m., TFO Zumwalt observed a Hispanic male exit Garcia-Salazar's black Chevrolet Malibu and enter into a gray 1997 Nissan truck bearing Oklahoma tag MIU190 (which is registered to Ricardo Plateado at 708 North Kalanchoe Avenue, Broken Arrow, Oklahoma). During this investigation, investigators have previously identified Ricardo Plateado-Martinez to deliver bulk U.S. Currency to Urquiza-Urquiza. In addition, investigators have identified Garcia-Salazar to be a methamphetamine distributor, including distributing approximately 32 kilograms on March 12, 2024.

*D. At the same time, the white Dodge Challenger was driven to a different meeting*

56.   Meanwhile, at approximately 8:20 p.m., A/GS Wilson observed the white Dodge Challenger depart from Garcia-Salazar's apartment complex. A/GS Wilson did not observe who entered into the driver's seat of the vehicle. A/GS Wilson maintained physical and electronic surveillance on the white Dodge Challenger and observed the vehicle arrive to Dollar General, located at 5000 North 37th Street, Broken Arrow, Oklahoma at approximately 8:42 p.m. Approximately two minutes

later, A/GS Wilson observed a female exit the front passenger seat of the white
Dodge Challenger and get into a silver 2014 Acura sedan, bearing Oklahoma tag
MGW726. A/GS Wilson was unable to make a positive identification of this female.
Subsequently, the silver Acura sedan departed without anyone getting out from the
Dollar General parking lot. A/GS Wilson observed the silver Acura sedan to travel
southbound on North 37th Street (also known as South 209th East Avenue) and then
turn westbound on East Vail Street into a neighborhood. A/GS Wilson did not
follow the vehicle into the neighborhood.

**Daisy Villanueva's Texas Trip**

    *A. The Dodge Challenger traveled to **5746 NW 16th Street Oklahoma City, Oklahoma** and then drove to Houston, Texas*

57.    After the meeting at the Dollar General at approximately 9:03 p.m., GPS
location data indicated the white Dodge Challenger arrived back at 7215 South 92nd
East Avenue where it stayed for a little less than two hours before leaving again.

58.    On April 11, 2024, at approximately 12:24 a.m., GPS location data for the
white Dodge Challenger indicated it arrived at the OnCue, located at 3620 NW 39th
Street Oklahoma City, Oklahoma. At approximately 12:34 a.m., GPS location data
indicated the white Dodge Challenger departed the OnCue. At approximately 12:39
a.m., GPS location data indicated the white Dodge Challenger arrived at the
McDonalds at U.S. 66 and North MacArthur Boulevard. At approximately 12:42
a.m., GPS location data indicated the white Dodge Challenger departed the

McDonalds. At approximately 12:45 a.m., the GPS location data indicated the white Dodge Challenger arrived at the apartment complex containing **5746 NW 16th Street Oklahoma City, Oklahoma**.

59.  About 6 hours later, GPS location data indicated the white Dodge Challenger departed **5746 NW 16th Street Oklahoma City, Oklahoma**. Later that afternoon, GPS location data indicated the white Dodge Challenger arrived in the Houston, Texas area. While in Houston, Texas, the GPS location data indicated the white Dodge Challenger made a couple of stops.

60.  After being in Houston for approximately two hours, GPS location data indicated the white Dodge Challenger departed the Houston-area, traveling northbound. On April 12, 2024, at approximately 1:23 a.m., GPS location data indicated the white Dodge Challenger arrived at **5746 NW 16th Street Oklahoma City, Oklahoma**.

**Statement of belief for this trip**

61.  Based on my training and experience, and knowledge of this investigation, I believe that on April 10, 2024, Daisy Villanueva traveled in the white Dodge Challenger to Tulsa, Oklahoma to receive drug proceeds for the DTO and then transported the drug proceeds to Oklahoma City, Oklahoma. Additionally, on April 11, 2023, I believe Daisy Villanueva traveled in the white Dodge Challenger to Houston, Texas to deliver a bulk amount of drug proceeds to other members of the DTO. Furthermore, I know based on my training, experience and knowledge of this

investigation, that Houston, Texas is a source city for the DTO's supply of methamphetamine.

62.    Furthermore, GPS location data for telephone number 405-833-4853, suspected to be utilized by Daisy Villanueva traveled with the white Dodge Challenger on April 10, 2024, when the Dodge Challenger traveled to Tulsa, Oklahoma, as well as on April 11, 2024, when the Dodge Challenger traveled to Houston, Texas.

### Conclusion

63.    Based on the information above, I submit that there is probable cause to search **5746 NW 16th Street Apartment #3, Oklahoma City, Oklahoma**, Western District of Oklahoma, as further described in Attachment A, and seize the items described in Attachment B.

64.  I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

Respectfully submitted,

Task Force Officer Anthony Finnegan
Drug Enforcement Administration

Subscribed and sworn to by phone on April 22, 2024.

SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE